# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**DIDION MILLING, INC.,**

    **Plaintiff,**

  **v.**            **Case No. 05-C-227**

**AGRO DISTRIBUTION, LLC.,**

    **Defendant.**

---

## DECISION AND ORDER GRANTING AGRO'S MOTION FOR SUMMARY JUDGMENT, DENYING DIDION'S MOTION TO SUPPLEMENT THE RECORD, AND GRANTING IN PART DIDION'S MOTION TO STRIKE.

---

On March 25, 2003, Didion Milling, Inc. ("Didion") filed suit against Terra International, Inc. ("Terra") and Agro Distribution, LLC ("Agro") in Milwaukee County Circuit Court. (Case No. 2003CV2741.) On June 4, 2003, the defendants removed the case to federal court and it was randomly assigned to Senior Judge Thomas J. Curran. (Case No. 03-C-516.) On June 28, 2004, Agro moved for partial summary judgment and on August 3, 2004, the motion was denied by Judge Curran. On August 16, 2004, Didion filed a motion for partial summary judgment, which was denied by Judge Curran on October 15, 2004. On January 6, 2005, the parties submitted a stipulation of dismissal of that case without prejudice.

On February 28, 2005, Didion filed the present action, which was reassigned to this court upon all parties' consent to the full jurisdiction of a magistrate judge. The complaint raises breach of contract, accounting, and tortious interference with contract claims against defendants Terra and Agro. On April 1, 2005, Agro answered the complaint and filed a counterclaim against Didion seeking declaratory judgment regarding the assignment of contract and alleging four distinct breach

of contract causes of action and one cause of action for negligent property damage. On April 26, 2005, then-defendant Terra similarly answered and filed a counterclaim against Didion. On December 27, 2005, pursuant to the parties' stipulation, this court entered an order dismissing Terra as a defendant, dismissing Terra's counterclaim against Didion, and dismissing Didion's tortious interference of contract cause of action against Agro.

On May 1, 2006, Agro filed a motion for partial summary judgment seeking dismissal of Didion's complaint and judgment on Agro's breach of contract claims. Agro also filed a motion in limine seeking to exclude Didion's accounting expert. On June 20, 2006, Didion responded to Agro's motions and on June 20 and 22, 2006, respectively, filed motions to supplement the record and to strike portions of Jonathan C. Miesen's ("Miesen") supplemental affidavit. The pleadings on all of these motions are closed and the matters are ready for resolution.

## FACTUAL SUMMARY

This matter comes before this court based upon the diversity of the parties. Didion formerly operated a grain merchandising business at five locations in Wisconsin. (Hybertson Aff. ¶3.) In the Spring of 1997, Didion agreed to sell this business to Terra. (Hybertson Aff. ¶4.) The terms of this sale were set forth in an asset purchase agreement ("APA"), which is included in the record as Exhibit A to the complaint. The APA contained an "earn-out" payment provision under which Terra agreed to pay to Didion additional sums if the net cash flow of the grain business exceeded certain "hurdles" during the five years following the sale. (APA § 2.2.1.)

Although the grain business became a part of Terra's overall operations, which included fertilizer manufacturing, fertilizer sales, and seed sales, (Miesen Aff., Ex. C, Rector Dep. I, pp. 14, 22; DPFF ¶4), the grain operation was treated as an independent business for the purposes of calculating its net cash flow. The APA contained a list of nine, non-exhaustive "guidelines" that set forth how the net cash flow of the grain business should be calculated. (APA § 6.3.)

2

Despite a provision in the APA prohibiting assignment of the contract without Didion's written consent, (APA § 13.7), Terra nonetheless sold the grain business to Cenex/Land O'Lakes Agronomy Company, (Hybertson Aff. ¶7), who in turn sold the grain business to Agro (Hybertson Aff. ¶8). Agro is a limited liability company whose sole member is another limited liability company, Agriliance. The members of Agriliance are Land O'Lakes, Inc., and United Country Brands, LLC, whose sole member is Cenex Harvest States Cooperatives.

It was not until Agro's acquisition that the grain business produced a sufficient net cash flow to generate any annual earn out payments. (Hybertson Aff. ¶10.) When owned by Agro, the grain business was able to generate earn out payments totaling $934,113.00. (Hybertson Aff. ¶¶10, 12.) Pursuant to the terms of the APA, two-thirds of these earn out payments were paid directly to Didion and the remaining one-third was to be deposited into an escrow account. (APA § 2.2.1; Hybertson Aff. ¶5.) Because Agro and Didion were not able to agree upon the terms of an escrow agreement, the earn out payments that should have been held in escrow were instead deposited into the trust account of the law firm retained by Didion. (Hybertson Aff. ¶11.)

The parties agreed in the APA that if the total net cash flow for the grain business did not equal $4,000,000.00, then two-thirds of the shortfall would be paid from the escrow fund to the buyer. (APA § 2.2.2.) Over the five year earn out period, based upon Agro's calculations, the grain business generated net cash flow in the amount of $3,219,172.00, and thus there was a shortfall of $780,828.00. (Hybertson Aff. ¶13.) Under the terms of the APA, Agro was entitled to two-thirds of the shortfall, or $523,154.76. (APA § 2.2; Hybertson Aff. ¶13.) However, only $311,371.00 had been deposited, and thus Agro's claim was limited to the balance of the escrow funds held in the trust account. (Hybertson Aff. ¶13.) Didion, however, claims that the net cash flow exceeded $4,000,000.00 during the five year earn out period, and thus Agro is not entitled to the balance of the funds held in trust.

3

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). As provided under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise "proper" motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those facts which, under the governing substantive law, might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of such material facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id.

The movant bears the burden to establish that there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970); see also Celotex Corp., 477 U.S. at 323. The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson, 477 U.S. at 255; Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988); Spring v. Sheboygan Area School Dist., 865 F.2d 883, 886 (7th Cir. 1989). Further, "on summary judgment, a court can neither make a credibility determination nor choose between competing interests." Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1041 (7th Cir. 1993).

If the moving party meets its burden, the nonmoving party then has the burden to present specific facts showing that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). Under Wisconsin law, contract interpretation is a matter of law, Elkhart Lake's Rd. Am. v. Chicago Historic Races, 158 F.3d 970 (7th Cir. 1998), and therefore summary judgment can be particularly appropriate in matters of contract interpretation, Tingstol Co. v. Rainbow Sales, Inc., 218 F.3d 770, 771 (7th Cir. 2000).

## ANALYSIS

This case comes before the court on diversity jurisdiction pursuant to 28 U.S.C. § 1332, and thus this court is required to apply state substantive law. Lexington Ins. Co. v. Rugg & Knopp, Inc., 165 F.3d 1087 (7th Cir. 1999). Moreover, the APA states that Wisconsin law shall apply to disputes arising out of the APA, (APA §13.11).

Didion currently alleges three separate causes of action against Agro: (1) breach of the APA; (2) accounting; and (3) breach of an implied duty of good faith and fair dealing. In its motion for partial summary judgment, Agro asks the court to dismiss Didion's complaint with prejudice, direct the immediate dispersal of the $311,371.00 held in trust, award Agro a money judgment on its breach of contract claim against Didion, award Agro a money judgment for the installation of an electrical meter, and award Agro a money judgment for back rent due from Didion. Starting with the causes of action contained in the complaint, each of these claims shall be addressed in turn.

**Breach of the APA**

Didion argues that Agro breached the APA by the manner in which it calculated the net cash flow generated by the grain business during the five-year earn out period. Specifically, Didion argues that Agro improperly assessed taxes against the income of the grain business, improperly charged interest on working capital provided to the grain business from Agro's other divisions, and improperly expensed a payment to Richard Gohlke in 1999 rather than 1998. Additionally, Didion argues that Agro breached the APA by failing to provide Didion with information upon which net cash flow amount was based.

**1. Taxes**

The section of the APA detailing how the earn out should be calculated provides, in pertinent part, "(2) a combined federal-state-local tax rate of no greater than 36% (unless a higher

rate is mandated by applicable governmental authorities) will be applied, which will be the same rate as applied to Buyer's other operations." (APA §6.3(2).)

Didion argues that no amount for taxes should have been considered in the calculation of the net cash flow because, as a limited liability company ("LLC"), Agro did not directly pay any federal, state, or local taxes on its income. Rather, taxes were paid by Agro's constituent members, such as Land O' Lakes, Inc. Didion points out that when the APA was drafted, Terra, an entity with a corporate structure entirely distinct from Agro, was the "Buyer." Terra was a parent holding company of many other operations and thus Terra was itself directly paying taxes based upon the income of its subsidiary holdings. Thus, subsection (2) requires that Terra apply the same tax rate to the income generated from the grain operation as applied to its other operations.

However, because the subsequent buyer, Agro, does not have any corporate subsidiaries, Didion argues that Agro itself did not directly pay taxes, and thus no taxes could be appropriately levied against the income of the grain operation.

In reviewing the APA, there is no doubt that the parties intended that taxes would be included in the net cash flow calculation. The first clause of subsection (2) specifically states this. More convincingly, however, is the first sentence of section 6.3, which defines net cash flow and states, "'Net Cash Flow,' as used in this Agreement, means the post-Closing, *after-tax* earnings, determined on an accrual basis in accordance with generally accepted accounting principles applied consistently among Buyer's operations . . . ." (emphasis added). The evidence is also undisputed that taxes were paid on income generated by the grain business and thus taxes were appropriately considered in the net cash flow calculation. However, in light of the subsequent sale of the grain business and the different structures between Terra and Agro, the APA does not contain a means by which the applicable tax rate for an entity such as Agro may be calculated.

6

The first clause of subsection (2) simply states that a *maximum* rate of 36% shall be applied; it does not, as Agro agues, set the actual rate that shall be applied. Rather, the subsequent dependent clause of subsection (2) describes how the rate will be determined when it says that the rate applied to the income of the grain business shall be the same as that "applied to Buyer's other operations." Since Agro does not have other operations, the APA contains no means by which to determine the rate that shall be applied to the income from the grain business. Therefore, the circumstances presented to this court are ones not accounted for in the APA and apparently not contemplated by the parties.

When a contract omits an essential term, under Wisconsin law, courts apply the rule set forth in §204 of the Restatement (Second) of Contracts. Stahl v. Sentry Ins., 180 Wis. 2d 299, 306, 509 N.W.2d 320, 322-23 (Ct. App. 1993); Spencer v. Spencer, 140 Wis. 2d 447, 451, 410 N.W.2d 629, 631 (Ct. App. 1987); Northern Crossarm Co., Inc., v. Chemical Specialties, Inc., 318 F.Supp.2d 752, 759-60 (W.D. Wis. 2004).

Section 204 of the Restatement (Second) of Contracts states:

> When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court.

Evaluating the contract as a whole, the court believes that if the parties had anticipated a situation where the buyer was not a corporate entity with subsidiaries but instead was itself an entity comprised of corporate members, the parties would have required that the tax rate applied to the grain business for the purposes of calculating the net cash flow and the earn out payments then be the same as the tax rate applied to the member companies' subsidiaries or subdivisions. Evaluating § 6.3 of the APA as a whole, it is clear that Didion was concerned with Terra obtaining an advantage by treating the grain business differently than its other operations. Subsections (2), (5), and (7), of § 6.3 of the APA state that certain matters shall be calculated for the grain business in

7

the same manner as that used for Terra's other operations. Didion's concern in this regard is reasonable given that inequitable treatment would certainly impact the net cash flow calculations and the earn out payments.

In other words, it is clear that the parties intended that the buyer would be able to deduct taxes in making its calculations. The concern for Didion was that such deduction would be equitable. The fact that the assignee buyer was an entity that was not required to directly pay taxes should not operate to allow Didion to escape the consequences of a tax deduction. That certainly would not be equitable from the buyer's standpoint. Equity works both ways, so in regard to Agro, the tax deduction is calculated by looking to Agro's constituent members.

The evidence is undisputed that Agro assessed taxes against the grain business in the same manner that Agro's constituent members assessed taxes against their subdivisions. It is undisputed that this tax rate exceeded 36% and therefore Agro assessed the maximum rate permitted by the APA to the income of the grain business for the purposes of calculating its net cash flow and the earn out provision. Therefore, Agro's motion for summary judgment shall be granted as to this claim.

### 2.    Interest

The section of the APA detailing how the earn out should be calculated provides, in pertinent part,

> (4) no deduction will be made for interest on indebtedness incurred for other than working capital reasonably required by the Grain Business; (5) deduction will be made for interest on working capital, where working capital will equal current assets less current liabilities and the interest charged will be calculated monthly at the same rate of interest as charged to Buyer's other operations, which rate will be based on and close to Buyer's cost of capital.

(APA § 6.3(4)-(5).)

Didion argues that subsection (5) sets forth the manner in which the interest on working capital will be charged but becomes applicable only if the working capital is reasonably required by the grain business, as is required by subsection (4).

Agro contends that subsections (4) and (5) each cover two entirely different concepts and in no way does subsection (4) create a precondition to the applicability of subsection (5). Specifically, Agro argues that subsection (4) applies to debt incurred from third party lenders whereas subsection (5) applies to intercompany interest charged by one division for another division's use of working capital.

Didion argues that the mere fact that subsections (4) and (5) are subject to more than one interpretation creates a dispute of material fact that precludes summary judgment. The court need not decide which, if either, of the parties' interpretations of subsection (4) and (5) is correct. Rather, the question that this court must resolve is whether there is a dispute of material fact regarding the question of whether Agro could appropriately include interest charged by Agro for the grain businesses' use of its own working capital.

Based upon a plain reading of subsections (4) and (5), Didion's interpretation is unpersuasive because subsection (5) explicitly permits the inclusion of the same rate of interest charged to the buyer's other operations for the grain business' use of the buyer's working capital in the calculation of net cash flow. If the parties had intended to include interest charged only by third-party lenders in the net cash flow calculation, it would have been entirely unnecessary to include a formula for determining the amount of working capital utilized by the grain business. Rather, by including this formula, it is clear that the parties intended subsection (5) to address what even Didion's own expert acknowledges is a common business practice of a division of a company being charged interest for the use of another division's working capital. (See Matson Dep. Vol. II at 100-01.) Subsection (5) permits this common business practice to be included in the net cash flow

calculation but requires that Agro apply the same interest rate to the grain business as it does to its other divisions and limits the interest rate related to Agro's actual cost of the capital.

Notably, Didion does not make the argument regarding the assessment of interest that it made regarding the assessment of taxes, that being that assessment is improper because of the differences in structure between Terra and Agro. However, it appears that the argument would have been equally applicable because, as stated above, the APA required that both taxes and interest be assessed against the grain operation in the same manner as these expenses are assessed against the buyer's "other operations." To the extent that this argument may be applicable to the assessment of interest, the court relies upon the rationale detailed above to reject the argument that a difference in structure between Agro and Terra is an issue of consequence.

### 3. Gohlke Payment

Didion sold its Ripon, Wisconsin location to Richard Gohlke prior to the sale of the grain business to Terra. (Rector Aff. ¶13.) This was a sale/lease-back transaction under which Didion continued to use the facility and agreed to pay Gohlke rent in the form of a share of the annual profits generated by the location. (Rector Aff. ¶13; Miesen Aff. Ex. N at *8.) Prior to Didion's sale of the grain business to Terra, Didion and Gohlke were involved in a dispute over the calculation of the profits of the Ripon location. (Rector Aff. ¶14; Miesen Aff. Ex. N at *10.) This lease terminated prior to Terra's purchase of the grain business. As a result, there was no lease agreement between Terra and Gohlke during Terra's ownership of the grain business. Thus, Terra did not know how much, if anything was due Gohlke. (Rector Aff. ¶15.)

In 1998, Gohlke threatened to lock Terra out of the Ripon location unless it made a lump-sum payment of $200,000.00 to him. (Rector Aff. ¶15.) Terra was uncertain as to the nature of this payment and thus accounted for the payment on the balance sheet for the grain business as an asset on the basis it was pre-paid rent rather than an expense such as rent paid. (Rector Aff. ¶15.)

10

In 1999, Terra reached a settlement with Gohlke under which Gohlke was permitted to keep the $200,000.00 payment and Terra agreed to make a $230,000.00 annual lease payment to Gohlke. (Rector Aff. ¶16.) After this settlement, Terra converted the $200,000 payment as an asset to an expense on its balance sheet. (Rector Aff. ¶17.) Thus, the "income" of the grain business was reduced by $200,000.00 in 1999. (Rector Aff. ¶17.)

Didion's expert testified that the Gohlke payment should have been expensed in 1998 rather than 1999; however, his report fails to include any basis for this conclusion and he testified at his deposition that he thought that Terra and Gohlke entered into their settlement in 1998 rather than 1999. (Matson Dep. Vol. II at 79-80.) Thus, Agro argues that this payment was properly recorded as an expense in 1999. Didion has failed to provide any argument in response the Agro's motion for summary judgment regarding this claim.

Turning to the merits of Didion's claim, the court finds no basis for Didion's position that expensing the payment in 1999 as opposed to 1998 violated the terms of the APA. The only evidence offered by Didion to indicate that this expense was improper is the opinion of its expert. However, as acknowledged in his deposition, Didion's expert mistakenly believed that the settlement resulted in 1998 and therefore should have been expensed in that year. The undisputed evidence is that the settlement occurred in 1999. Thus, in view of the fact that the conclusion of Didion's expert is based on a mistake of fact, there is no evidence to indicate that Terra's actions violated the APA. Didion's failure to respond to Agro's motion for summary judgment on this ground simply underscores the fact that its claim has been rendered meritless. Therefore, the court shall grant Agro's motion for summary judgment as to this claim.

### 4. Failure to Provide Information

In paragraphs 37(a)-(b) of the amended complaint, Didion alleges that Agro breached the APA by "failing to provide Didion with the required financial data upon which each Earn-Out

11

Payment was based," and "failing to provide access at all reasonable times and upon reasonable notice to all books, records and other supporting information reasonably necessary to calculate Net Cash Flow." In section 6.3, the APA states:

> Each payment to Seller under Section 2.2.1 will be accompanied by a summary of the financial data upon which the payment is based. Within fifteen (15) days after the end of each calendar month during the Calculation Periods, Buyer will provide Seller with an unaudited statement of the prior calendar month's Net Cash Flow and profit and loss of the Grain Business substantially in the form of the example statement contained in Schedule 16. Seller or Seller's designated representative will have access at all reasonable times and upon reasonable notice to all books, records, and other supporting information reasonably necessary to calculate Net Cash Flow.

Agro argues that summary judgment is appropriate in its favor because the undisputed evidence indicates that, although sometimes untimely, Agro provided Didion with all information required under the APA. Didion has not alleged untimely disclosure as a cause of action in its amended complaint. In its responsive briefs, Didion fails to directly respond to Agro's arguments, but in its response to Agro's Proposed Findings of Fact, Didion simply states that "as of May 30, 2000, Terra had never provided the earn-out supporting documentation despite several written requests." (Didion Resp. to Agro Prop. Find. Of Fact ¶98.) Thus, Didion implicitly acknowledges that at sometime after May 31, 2000, Didion was provided with: (1) "a summary of the financial data upon which" the earn out payment was based; and (2) "an unaudited statement of the prior calendar month's Net Cash Flow and profit and loss of the Grain Business."

In its response, Didion provides a list of ten specific items that it requested from Agro but has not received. These include:

(1) supporting records for all the charges and expenses;

(2) journal entries for each month of the five year agreement and supporting documentation for all entries;

(3) inventory information to include the following: valuation, including contracts to market, purchase and sale values, discounts; future positions; physical write downs;

(4) detail of interest rate charged locations company wide;

(5) support for interest calculation by location by month;

(6) detailed breakdown of general and administrative expenses at the corporate level to include: legal; accounting in-house service; human resources; regulatory compliance service; safety; risk management and insurance premium; banking and finance;

(7) payroll information by location to include number of employees, hours worked and salaries paid;

(8) breakdown and explanation of professional services charged to locations;

(9) breakdown of all demurrage charges and grain freight expenses; and

(10) breakdown of bushels handled by location by type by month to include discounts taken on purchases and discounts received on sales.

(Didion Resp. 10-11.) Notwithstanding Didion's insistence upon the foregoing breakdowns, there is no provision in the APA requiring that Agro provide this categorization of information. Rather, Agro is required to provide Didion with (1) "a summary of the financial data upon which the payment is based" and (2) "an unaudited statement of the prior calendar month's Net Cash Flow and profit and loss of the Grain Business." The facts are undisputed that Agro provided Didion with these broader information categories as required by the APA, and therefore Agro's motion for summary judgment shall be granted as to this claim.

As for Didion's claim that Agro breached the APA by not permitting Didion appropriate access "to all books, records and other supporting information reasonably necessary to calculate Net

Cash Flow," it appears that Didion is attempting to argue that the contractual burden of access somehow imposes upon Agro the duty to produce any documents it requests. Obviously, the comparatively passive burden of "access" is entirely distinct from the active and affirmative burden of production. However, the evidence is undisputed that not only did Agro provide Didion access to any records requested, there is absolutely no evidence to indicate that Agro ever denied Didion the access it requested.

But Didion did not act upon Agro's invitation. Rather, Didion demanded more than mere access and sought the production of voluminous amounts of information, at times not only demanding the raw data but detailed explanations of the data. Agro made substantial efforts to comply with these requests but for a variety of reasons was either unable or chose not to comply.

On June 14, 2000, Agro and Didion held a conference call during which Agro agreed to allow Didion to inspect books and records located at Agro's facilities in Johnson Creek and Sioux City, Iowa. (Hybertson Aff. ¶18; Ex. G.) Agro did not receive any further requests for information from Didion until March 6, 2002 when Didion's Chief Executive Officer ("CEO") requested access to a number of accounting records. (Hybertson Aff. ¶20; Ex. I.) On April 19, 2002, Didion's CEO sent Agro a letter requesting additional information, which began, "Thank you very much for access to records as requested in our letter to you of March 6, 2002." (Hybertson Aff. ¶20; Ex. I.) In this letter, Didion's CEO requests to review certain records, such as monthly profit and loss statements and any supporting reports, divided by location, monthly interest expenses, divided by location, itemization of all expenses allocated, including the allocation method used and justification for the allocation method detailed by month and location. (Hybertson Aff. Ex. I.)

On April 26, 2002, Agro responded and stated that it would continue to provide Didion with documents required by the APA and would provide Didion with access to all financial and accounting information. (Hybertson Aff. ¶23; Ex. K.) Agro again invited Didion to visit its various

offices in order to inspect requested records and offered times during which such a visit may occur. (Hybertson Aff. ¶23; Ex. K.) During the spring and summer of 2002, Didion's consultant, Jeffrey L. MacKenzie visited Agro's Johnson Creek location and briefly visited its Inver Grove Heights, Minnesota location. (Hybertson Aff. ¶24.)

On July 25, 2002, following Agro's demand that Didion release the funds held in trust by its attorneys, Didion sent a letter stating that it would not release the funds and demanded that Agro assemble, copy, and produce a large number of accounting records and submit written, narrative answers to detailed accounting questions. (Hybertson Aff. ¶27; Ex. N.) For example, Didion requested, "[e]very Journal entry made to adjust the G/L accounts of Didion together with detailed explanations of the rationale for all adjustments, accruals, or expenses;" "[a] complete list of all employees, their job descriptions, and annual compensation;" "[a] list and explanation of all major repairs [sic] projects made during the agreement together with project costs;" "[a] detailed explanation of all employee training including but not limited to safety training by Terra and/or Agro together with costs;" and "[a] detailed list and explanation for all expense allocations made to the Didion accounts from or for Corporation or General accounts by Terra and/or Agro together with costs for Didion activities not otherwise explained or requested." (Hybertson Aff. Ex. N.) Agro responded to this request on September 25, 2002 by providing much of the information requested or stating that the requested information was being compiled; however, Agro stated that certain of the requests were overly broad or unduly burdensome and therefore the requested information would not be provided. (Hybertson Aff. ¶29; Ex. O.)

Agro continued to make efforts to comply with Didion's requests and these efforts are detailed in Exhibit Q to Hybertson's Affidavit. On February 24, 2003, Agro sent a letter to Didion providing Didion with copies of certain documents and offering Didion full and complete access to its computerized accounting systems. (Hybertson Aff. ¶33; Ex. R.) Didion never attempted to

schedule a time to access Agro's computer systems. (Hybertson Aff. ¶34.) On April 22, 2003 Agro again sent a letter to Didion requesting that arrangements be made for Didion's access to Agro's computer systems and again Didion failed to respond. (Hybertson Aff. ¶35-36.)

Didion does not substantively dispute these facts. Therefore, although the parties disagree whether Agro produced all the records requested, this dispute is immaterial to the question of whether Agro breached the terms of the APA. The APA does not require absolute and complete production of any documents, compiled in the manner demanded by Didion. Rather, as stated before, the burden of production is limited to: (1) "a summary of the financial data upon which the payment is based"; and (2) "an unaudited statement of the prior calendar month's Net Cash Flow and profit and loss of the Grain Business." As for all other documents and information relating to the net cash flow calculation, the APA imposes upon Agro the burden of providing mere access. Although access likely requires more than merely providing literal access to Didion's representative, as discussed below, this certainly does not require that Agro locate, copy, and compile any financial record Didion demanded, and it most certainly does not require Agro to provide detailed explanations of the records. Because the evidence is undisputed that Agro never denied Didion access to the financial records requested, Agro's motion for summary judgment shall be granted as to this claim.

**Accounting**

"In order to sustain a suit in equity for an accounting, some special and substantial ground of equity jurisdiction must be alleged, and it must appear that the remedy at law is inadequate." Ellis v. Southwestern Land Co., 102 Wis. 409, 412, 78 N.W. 583, 584 (1899) (citing Stein v. Benedict, 83 Wis. 602, 53 N.W. 891 (1892)); see also Nickel v. Gillette, 2006 U.S. Dist. LEXIS 66741, 5-6 (W.D. Wis. 2006) (citing Anitgo Superior Nursing Home, Inc. v. First Fed. S & L Ass'n, 51 Wis. 2d 196, 201, 186 N.W.2d 265; Walter Diehnelt, Inc. v. Root, 183 Wis. 535, 198 N.W. 388

(1924)). "These special grounds of equity jurisdiction may be stated, generally, to be the need of a discovery, the complicated character of the accounts, and the existence of a fiduciary or trust relation." Walter Diehnelt, Inc. v. Root, 183 Wis. 535, 538, 198 N.W. 388, 389 (1924) (citing Stein, 83 Wis. 602, 53 N.W. 891).

The Wisconsin Supreme Court and the Wisconsin Court of Appeals have infrequently addressed an accounting cause of action and have not addressed the issue of an accounting under circumstances analogous to those presented in this case. Where there is a dearth of Wisconsin law, this court must attempt to predict how the Wisconsin Supreme Court would decide the issues presented. Id. (citing Allen v. TransAmerica Ins. Co., 128 F.3d 462, 466 (7th Cir. 1997)). "Where the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." Id. "In the absence of Wisconsin authority, [a federal court] may consider decisions from other jurisdictions." Id. (citing Valerio v. Home Ins. Co., 80 F.3d 226, 228 (7th Cir. 1996)).

Didion claims that an accounting is appropriate because of the need for discovery and because of the complicated character of the accounts. Specifically, it argues that "[o]nly a full and complete accounting by Agro can determine the proper and exact amount due and owing to Didion," and that further discovery is needed to determine precisely how Agro calculated the net cash flow. (Didion Resp. 24.)

As for Didion's claim that an accounting is necessary on the basis that Didion lacks an adequate remedy in law on the issue of discovery, the court considers this claim without merit. Didion is contractually empowered with full access to Agro's financial documents relating to the grain business. If denied access, Didion is presented an adequate remedy in law in the form of a breach of contract cause of action.

17

Didion has pursued a breach of contract cause of action, and therefore, in addition to its contractual authority, Didion has had the benefit of full civil discovery. Although an accounting cause of action was traditionally utilized as a means of obtaining access to relevant records, the need for a party to pursue an accounting cause of action in order to obtain such access has been greatly minimized in light of the modern federal discovery rules. See Litton Systems, Inc. v. Frigitemp Corp., 613 F. Supp 1386, 1390 (S.D. Miss. 1985). Thus, in light of modern liberal discovery rules, present legal remedies offer a more sufficient remedy than they may have otherwise provided in the past.

This action has included roughly three years of comprehensive discovery. This discovery included seventeen depositions, (Supp. Miesen Aff. ¶4), and the defendants have provided to the plaintiff more than sixty boxes of records, (Supp. Miesen Aff. ¶¶5-6), and more than 575 gigabytes of electronic data, (Supp. Miesen Aff. ¶¶7-10 and Exs. A-B). If printed, these 575 gigabytes of data would fill more than ten thousand banker's boxes. (Supp. Miesen Aff. ¶¶7-10 and Exs A-B.) Additionally, although Didion argues now in its response that there is information that Agro has not provided, it is notable to the court that Didion has never made a single motion to compel discovery.

Didion's breach of contract cause of action has permitted Didion to discover all information necessary to prove its claim that Agro improperly calculated the net cash flow of the grain business. An accounting cause of action would not provide Didion with any additional access. Therefore, because Didion's remedies at law provide Didion with access to full civil discovery to address its claims, the need for discovery is not a basis for this court to exercise its jurisdiction in equity. See 1 Am Jur 2d Accounts and Accounting § 58.

Rather, the additional benefit that Didion seeks from an accounting cause of action, as opposed to pursuing such information through the course of discovery, is that Didion would avoid the arduous task of analysis. Rather than Didion retaining an expert to make sense of Agro's

business records, Didion seeks to impose upon Agro the burden to affirmatively prove to Didion's satisfaction that it properly calculated the net cash flow of the grain business.

There is no doubt the task of analyzing years worth of records from any business is a difficult one. Such difficulty is inherent most any time a plaintiff seeks to prove its claim or resulting damages in an action arising out of a complex commercial transaction. However, this inherent difficulty does not render accounts so complicated so as to justify a cause of action for an accounting. Absent the existence of a fiduciary relationship, an independent action for an accounting will be sustained only when an account is so complicated that absent an accounting a court or jury could not examine the account with the requisite accuracy. See 1 Am Jur 2d Accounts and Accounting § 57. Although Didion, and no less Agro, have demonstrated that this litigation is complex, the court is presented no reason as to why Agro's records are so complicated that an accounting is necessary.

Didion attempts to analogize this case to a recent Seventh Circuit decision in which the court found the district court did not abuse its discretion when it applied Illinois law and ordered an accounting regarding the defendant's counterclaim on the basis that plaintiff engaged in fraud by not keeping any records of the amounts it allegedly owed the defendant. ABM Marking, Inc. v. Zanasi Fratelli, S.R.L., 353 F.3d 541, 545 (7th Cir. 2003). This attempted analogy is inapposite. Didion does not allege that Agro engaged in fraud. The word fraud does not appear in the complaint or amended complaint and neither of the complaints meet the heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b).

As an extraordinary equitable remedy, Bradshaw v. Thompson, 454 F.2d 75, 79 (6th Cir. 1972), a court has broad discretion to determine when it is appropriate to order an accounting. First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1011 (7th Cir. 1985). Under the facts presented in this case, the plaintiff has failed to demonstrate that its legal remedies

are insufficient. The fact that the plaintiff's breach of contract cause of action has failed to survive summary judgment does not indicate that this remedy in law is inadequate; rather, the plaintiff has simply failed to establish a claim. See Heller v. Am. Indus. Prop. Reit, 156 F. Supp. 2d 645 (W.D. Tex. 2000). Therefore, the court shall grant the defendant's motion for summary judgment regarding the plaintiff's cause of action for an accounting.

**Duty of Good Faith**

Parties to every contract have an implied duty of good faith and fair dealing. Metro. Ventures, LLC v. GEA Assocs., 2006 WI 71, ¶35, 291 Wis. 2d 393, 717 N.W.2d 58 (citing Crown Life Ins. Co. v. LaBonte, 111 Wis. 2d 26, 44, 330 N.W.2d 201 (1983); Ekstrom v. State, 45 Wis. 2d 218, 222, 172 N.W.2d 660 (1969); Chayka v. Santini, 47 Wis. 2d 102, 108, 176 N.W.2d 561 (1970); Foseid v. State Bank of Cross Plains, 197 Wis. 2d 772, 796, 541 N.W.2d 203 (Ct. App. 1995); Market St. Assoc. Ltd. Partnership v. Frey, 941 F.2d 588, 593 (7th Cir. 1991)). A party has the duty to do everything necessary to carry out the contract and is similarly obligated to not do anything that would impair another party's ability to carry out its obligations under the contract. Id. (quoting Ekstrom, 45 Wis. 2d 218, 222, 172 N.W.2d 660). "A party can be liable for breach of the implied covenant of good faith 'even though all the terms of the written agreement may have been fulfilled.'" Kreckel v. Walbridge Aldinger Co., 2006 WI App 168, ¶20, 721 N.W.2d 508 (quoting Wisconsin Natural Gas Co. v. Gabe's Const. Co., 220 Wis. 2d 14, 21, 582 N.W.2d 118 (Ct. App. 1998)); see also Foseid v. State Bank, 197 Wis. 2d 772, 795, 541 N.W.2d 203, 212 (Ct. App. 1995). (citing Estate of Chayka, 47 Wis. 2d 102, 176 N.W.2d 561 (1970)). However, a party cannot be liable for a breach of the duty of good faith if the complained of conduct was specifically authorized by the express terms of the written agreement. Super Valu Stores, Inc. v. D-Mart Food Stores, Inc., 146 Wis. 2d 568, 577 431 N.W.2d 721, 726 (Ct. App. 1988). Good faith is simply a mutual duty of cooperativeness that prohibits a party from taking "opportunistic advantage in a way

that could not have been contemplated at the time of drafting." Market Street Assocs. Ltd. V. Frey, 941 F.2d 588, 595 (7th Cir. 1991) (applying Wisconsin law).

Good faith is commonly defined in the negative, such as "the absence of bad faith." Id. at 796, 541 N.W.2d at 213

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

Id. at 796-97, 541 N.W.2d 203, 213 (quoting Restatement (Second) of Contracts § 205 cmt. d.) However, an action need not rise to the level of tortious fraud in order to be actionable as a breach of the implied duty of good faith. Id. at 594.

In its amended complaint, Didion raises six ways in which Agro allegedly violated the duty of good faith owed Didion: (1) by purchasing the grain business with the intent of reselling it rather than operating it; (2) by failing to provide Didion with the required financial data upon which the earn out payment was based; (3) failing to provide access to information reasonably necessary to calculate the net cash flow; (4) failing to properly account for expenses in calculating the earn out payments; (5) including costs in the earn out calculations that were not properly included under the terms of the APA; and (6) charging excessive or unreasonable amounts for expenses in calculating the earn out payments.

After reviewing the parties' submissions, it appears that Didion has narrowed its breach of duty of good faith claim to these five potential bases: (1) Agro acquired the grain business aware that Didion had not consented to the assignment; (2) Agro focused on reselling the grain business rather than operating it; (3) Agro failed to provide Didion with monthly financial statements; (4)

Agro failed to provide Didion with the documentation necessary to support Agro's calculation of the net cash flow; and (5) Agro engaged in "sharp dealing" by assessing taxes, charging interest, and expensing the Gohlke payment in 1999 rather than 1998.

As for Didion's first contention that Agro breached the implied duty of good faith by acquiring the grain business absent Didion's consent to the assignment, the court finds that this alleged conduct cannot constitute a breach of the duty of good faith. At the time of this alleged interference with Didion's contractual rights under the APA, Agro was not a party to the APA; Agro, at that time, had absolutely no agreement with Didion. Obtaining Terra's grain operations and assuming Terra's obligations under the APA while allegedly knowing that the APA required Didion to consent to such assignment may, perhaps, form the basis for a tortious interference with contract claim. See Foseid, 197 Wis. 2d at 788 541 N.W.2d at 209. However, Didion has dismissed this cause of action against Agro. (Order of Dismissal, Docket No. 28, December 28, 2005.)

In any event, because Agro had no relationship with Didion at the time of this alleged breach of the duty of good faith, contractual or otherwise, Agro's assumption of Terra's obligations under the APA is not a breach of a duty of good faith, either in the formation or performance of the contract. Finally, although Didion states that it is not necessarily listing all the ways in which Agro violated the duty of good faith, the court finds it significant that Didion failed to raise this alleged basis for violating the duty of fair dealing in its amended complaint.

As for Didion's second contention that Agro's alleged focus upon reselling the grain business as opposed to operating it breached the duty of good faith, this court again finds no support for this basis. The undisputed evidence is that Agro sought to increase the success of the grain business and thereby justify a heftier sale price. Didion has not provided any explanation as to how Agro's efforts to increase the profitability of the business, which it did, negatively impacted Didion. In no way does this alleged conduct evidence bad faith and is quite simply the opposite of a "lack of

diligence and slacking off, [or] willful rendering of imperfect performance" which the Restatement (Second) of Contracts recognizes as being indicative of bad faith.

Didion demonstrates that increased profitability was the understanding of the parties when it alleges that part of its motivation for selling the grain business to Terra was a belief that Terra would be able to increase the profitability of the business by capitalizing upon its market synergies. Thus, profitability, not stability in ownership, was undoubtedly the underlying intent of the parties to the contract. Therefore, Agro's efforts to increase profitability for the mutual benefit of Agro and Didion cannot be considered a breach of the duty of good faith.

As for Didion's third contention that Agro breached the duty of good faith by failing to provide Didion with monthly statements, as discussed above, Didion has presented no evidence to indicate that Agro failed to provide this information in accordance with the APA. Although some of these statements were late, Didion does not allege that this untimeliness somehow constituted bad faith; at no point does Didion state that any of its claims are based upon the untimeliness of the reports. The court shall not construe or consider Didion's breach of the duty of good faith claim as including Agro's untimeliness because, although such untimeliness might constitute a breach of contract claim, Didion has elected not to pursue such a cause of action.

As for the fourth contention that there was a good faith duty to provide Didion with the documentary evidence that supported the monthly statements, the court finds no such duty encapsulated in the duty of good faith. The contract is explicit in its terms that all that is required is the production of certain monthly statements in a particular form. The duty of good faith cannot be used to re-write contract terms that are unambiguous. See Tele-Port, Inc. v. Ameritech Mobile Comm., 2001 WI App 261 ¶12, 248 Wis.2d 846, 637 N.W.2d 782 (2001) (citing Baxter Healthcare Corp. v. O.R. Concepts, Inc., 69 F.3d 785, 792 (7th Cir. 1995)) (applying Illinois law).

As for Didion's claim that Agro breached its duty of good faith by failing to provide Didion with the documents to support its calculations, this allegation is not supported by the evidence. As an initial matter, the court notes, as discussed above, there is no contractual duty that Agro produce the documents that formed the basis for its calculation of the net cash flow; rather, all that was required was access.

Nonetheless, contractual obligations undoubtedly contain penumbral obligations beyond those strictly contained within the four corners of the contract. However, these penumbral obligations, included in every contract as the implied duty of good faith, cannot create entirely distinct contractual rights; rather, the duty of good faith must be grounded within the four corners of the contract. However, the implied duty of good faith may be utilized to resolve ambiguities or unanticipated occurrences by inserting into a contact the terms that the parties would have agreed to if the ambiguity or unanticipated occurrence been contemplated at the time the contract was drafted. See Market Street, 941 F.2d at 595.

In the present contract, there is no ambiguity. The parties contemplated Didion's need or desire to verify the basis upon which the net cash flow and earn out payments were calculated. Certainly, this need could have been contractually resolved if the parties agreed that the buyer produce any document or manner of calculation Didion demanded. However, the parties did not so agree, but instead empowered Didion to obtain access to any relevant documents. In no way can Agro's duty of providing access to relevant documents be construed as an obligation to produce documents in the form or categories demanded by Didion.

Notwithstanding, Agro's contractual obligation to provide Didion with access to its records undoubtedly includes more than simply providing literal access in the form of providing a key to the file room or turning on a computer and leaving Didion's agent to search aimlessly for the records it seeks. If this was the manner in which Agro provided access, such conduct would likely

24

breach the implied duty of good faith. This would be viewed as bad faith or hindering reasonable access. However, there is no evidence that Agro engaged in such impeding conduct. Rather, the evidence indicates that Agro went far beyond its contractual obligation of providing access and instead, as explained above, Agro not only largely complied with Didion's extensive demands for the production of certain records, but also largely complied with Didion's demands to provide detailed explanations of these records.

In the opinion of the court, the conduct exhibited by Agro cannot form the basis for a claim of lack of good faith in regard to the production of documents. The implied duty of good faith does not require a party to undertake actions that are exceptionally burdensome or unreasonable. Didion provides no evidence as to how Agro's refusal to produce certain specified categories of documents, or explanations, obligations not required by the contract, evaded the spirit of the bargain, evidenced a lack of diligence or a willingness to render imperfect performance, interfered with the other party's performance, or in any other way constituted bad faith.

As for Didion's final contention that Agro engaged in "sharp dealing," the court finds this basis also without merit. Didion argues in its response that "[e]ven if Agro's actions in computing the earn out payments were not considered breaches of the APA, the actions violate Agro's good faith and fair dealing duties to Didion under the contract." (Resp. 42.)

In <u>Market Street Associates Ltd. v. Frey</u>, 941 F.2d 588 (7th Cir. 1991), a case where the Seventh Circuit applied Wisconsin law, the court discussed sharp dealing and stated that a party may violate the duty of good faith by engaging in sharp dealing when a party to a contract takes deliberate advantage of another party's oversight. <u>Id.</u> at 594. Such sharp dealing may or may not be actionable in tort. <u>Id.</u> However, the court was careful to observe that actions such as avoiding an unbargained for expense or obtaining an advantage by way of exploiting superior knowledge do not constitute sharp dealing or a breach of the duty of good faith. <u>Id.</u>

Case 2:05-cv-00227-AEG   Filed 03/02/07   Page 25 of 31   Document 74

Didion alleges that Agro engaged in sharp dealing by "consistently applying the earn out provisions in ways detrimental to the interests of Didion, and contrary to Didion's rights under the APA." (Resp. 42.) Aside from this conclusory statement, Didion provides no further factual support for this claim. The court notes that Didion does not use the phrase "sharp dealing" in its amended complaint.

The court finds no basis for Didion's contention that Agro's action's constituted "sharp dealing."  It appears to this court that Didion is simply trying to reargue its breach of contract claim under a different heading. Or perhaps Didion is attempting to argue that Agro breached the duty of good faith by strictly adhering to the contract and taking a penny-pinching perspective rather than taking a compromising approach. Certainly, as explained above, under certain circumstances a party may strictly adhere to a contract and nonetheless breach the duty of good faith. However, the duty of good faith does not impose upon a party an obligation to be charitable or altruistic. There is absolutely no indication that Agro was taking deliberate advantage of an oversight by Didion when Agro calculated the net cash flow and the earn out payments.

Therefore, Didion has failed meet its burden of presenting affirmative evidence as to how Agro allegedly breached the implied duty of good faith. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986). Thus, the court shall grant the defendant's motion for summary judgment as to Didion's breach of the implied duty of good faith cause of action.

**Agro's Counterclaims**

### 1. Lease

Didion entered into a lease with Terra for office space at the grain facility in Johnson Creek, Wisconsin which was then assigned to Agro along with the APA. Didion again does not dispute that it owes $5,250.00 for the months of January through June of 1999. However, Didion argues that this rent is due to Terra, not Agro, because Didion never consented to the assignment of the APA to

26

Agro. Didion states that it has not paid Terra this amount because the only rental invoices that it received were from Agro rather than Terra. (Didion Resp. to Agro Prop. Find. Of Fact ¶161.)

This lawsuit commenced by Didion is premised upon the fact that the APA was assigned to Agro, albeit without Didion's consent. In its response, Didion makes it clear that it did not consent, but without the assignment of the APA, Didion lacks any basis for making its claims against Agro. Similarly, at no point does Agro ever raise the defense that it is not bound to the terms of the APA because Terra's assignment was ineffective since it lacked Didion's consent. It is only in response to Agro's counterclaim that Didion affirmatively attempts to raise the issue of non-assignment. Didion cannot have it both ways. It cannot claim Agro is obligated under the terms of the APA in regard to the complaint, but is foreclosed from seeking relief for Didion's alleged breaches of the APA.

The evidence is undisputed that the APA was assigned to Agro and therefore the lease was assigned to Agro. There is also no dispute that Didion owes Agro $5,250.00 in rent for the months of January through June of 1999. There is no issue for trial on the matter of the rent. Therefore, the court shall grant Agro's motion for summary judgment as to this claim.

### 2.    Electrical Meter

Didion and Terra entered into a Dispute Resolution Agreement ("DRA") on July 1, 1998 in which Didion agreed to pay to Terra one-half the cost of an electrical meter at the Johnson Creek, Wisconsin facility, up to a cost of $6,000.00. (Hybertson Aff. Ex. T.) It is undisputed that the cost of the installation of the electrical meter exceeded $12,000.00. Didion does not dispute that it owes $6,000.00 for the cost of the electrical meter. It is further undisputed that Terra assigned the DRA to Agro. The DRA, unlike the APA, contains no clause prohibiting assignment. Therefore, Didion lacks any basis to argue that it does not owe Agro $6,000.00. Therefore, the court shall grant Agro's motion for summary judgment as to this claim.

### 3. Funds Held in Trust Account

Having granted the Agro's motion for summary judgment as to Didion's claims and Agro's counterclaims, the court must turn to the question of the funds held in the trust account of Didion's attorneys.

Didion has failed to present evidence that Agro breached the APA and thus Didion lacks any legal basis to withhold these funds from Agro. Therefore, the court shall order that these funds be transferred to Agro.

### 4. Prejudgment Interest

Prejudgment interest runs from the date that damages are liquidated or determinable. Merrill v. Wenzel Bros., Inc., 88 Wis. 2d 676, 698, 277 N.W.2d 799, 808-09 (1979); Teff v. United Health Plans Ins. Corp., 2003 WI App 115, ¶43, 265 Wis. 2d 703, 666 N.W.2d 38 (citing Johnson v. Pearson Agri-Systems, Inc., 119 Wis. 2d 766, 771, 350 N.W.2d 127 (1984)). Simply because there may be a dispute as to liability for the liquidated or determinable amount does not bar the assessment of interest. Nelson v. Travelers Ins. Co., 102 Wis. 2d 159, 170-71, 306 N.W.2d 71, 77 (1981); United Capitol Ins. Co. v. Bartolotta's Fireworks Co., 200 Wis. 2d 284, 300, 546 N.W.2d 198, 204 (Ct. App. 1996).

An amount is determinable when there is "a reasonably certain standard of measurement by the correct application of which one can ascertain the amount he owes." Wyandotte Chem. Corp. v. Royal Electric Mfg. Co., 66 Wis. 2d 577, 582, 225 N.W.2d 648, 651 (1975) (quoting Laycock v. Parker, 103 Wis. 161, 186 79 N.W. 327, 335 (1899)). If damages are determinable only by resolution of factual disputes, the amount is not fixed and determinable and therefore prejudgment interest is not appropriate. Teff, 2003 WI App 115, ¶50, 265 Wis. 2d 703, 666 N.W.2d 38 (citing Loehrke v. Wanta Builders, Inc., 151 Wis. 2d 695, 707, 445 N.W.2d 717 (Ct. App. 1989); Chevron Chem. Co. v. Deloitte & Touche, 176 Wis. 2d 935, 951, 501 N.W.2d 15 (1993)). In the context of a

contract dispute, if the contract is ambiguous and thus the court is required to interpret the contract, prejudgment interest is not appropriate because "the dispute goes to the very method of calculating the amount owed." Id. at ¶47 (quoting Jones v. Jenkins, 88 Wis. 2d 712, 726, 277 N.W.2d 815, 821 (1979)). However, if there is only one reasonable construction of the contract, prejudgment interest is appropriate. Id. Finally, prejudgment interest is recoverable only if the party had demanded the determinable amount from the party against whom interest is sought. Wyandotte Chem., 66 Wis. 2d at 594, 225 N.W.2d at 657.

It is undisputed that Didion owes to Agro a total of $11,250.00 for rent and the cost of installing an electrical meter. It is similarly undisputed that Agro made a formal demand for payment of the $11,250.00 from Didion on June 2, 2002. (Didion Resp. to Agro Prop. Find. Of Fact ¶¶157, 166; Hybertson Aff. Ex. L.) Agro seeks prejudgment interest from June 2, 2002 until the entry of judgment at the rate of five percent per year, as authorized under Wis. Stat. § 138.04. The $11,250.00 was fixed and determinable at the time of Agro's demand; the only potential dispute was to whom the amount was owed. Thus, under Wis. Stat. § 138.04, Agro is entitled to prejudgment interest at the rate of five percent per year on the $11,250.00 from the date of the June 2, 2002 demand to the date of the entry of judgment.

However, Agro is not entitled to prejudgment interest on the $311,371.00 that has been held in trust by Didion's attorneys on the basis that Agro is not entitled to these funds based upon Agro's alleged breach of the APA. The contract was ambiguous, thus requiring the court's interpretation, and therefore the dispute between the parties went to the very method of calculating the amount owed. Under Wisconsin law, prejudgment interest is not appropriate under such circumstances. See Teff, 2003 WI App 115, ¶47, 265 Wis. 2d 703, 666 N.W.2d 38.

29

## MOTION TO SUPPLEMENT RECORD

Agro pointed out in its pleadings supporting its motion for summary judgment that some of the evidence that Didion was relying upon was unsworn or outdated. Didion subsequently moved to either file a sur-reply in order to respond to Agro arguments, or to supplement the record with more competent evidence.

The court shall deny Didion's motion. Didion had its opportunity to present its evidence. Agro challenged that evidence. The court will not permit Didion an opportunity to present more evidence, which will engender a response from Agro, all having the effect of further dragging out the resolution of this case.

## MOTION TO STRIKE

Didion has filed a motion to strike paragraphs eleven through fifteen of Attorney Jonathan C. Miesen's affidavit (Docket No. 61) on the basis that the paragraphs contain legal opinions and legal arguments and therefore are not based upon the affiant's personal knowledge.

The challenged paragraphs do contain improper legal opinions and arguments and refer to matters that are not within the affiant's personal knowledge. Therefore, Didion's motion to strike shall be granted in part. However, the court shall accept paragraphs eleven and twelve to the extent that they authenticate Exhibits C and D, respectively.

## CONCLUSION

Agro's motion for summary judgment has disposed of Didion's complaint and certain causes of action in Agro's counterclaim. Therefore, the court shall conduct a telephone conference to discuss the status of the issues still remaining in this case. The court suspects that Agro's motion in limine to preclude the testimony of Didion's accounting expert may have been mooted by the court's resolution of Agro's motion for summary judgment. Therefore, the court shall withhold

ruling on this motion and resolve it upon its merits should resolution become necessary in light of the issues discussed during the telephone status conference.

**IT IS THEREFORE ORDERED** that Agro's motion for partial summary judgment is granted as follows:

1.  Didion's complaint is hereby dismissed with prejudice; and

2.  Agro will be granted judgment on Counts II, III, IV and V of its counterclaim.

**IT IS FURTHER ORDERED** that Didion's motion to supplement the record (Docket Number 66) is **denied**.

**IT IS FURTHER ORDERED** that the Didion's motion to strike (Docket Number 70) paragraphs eleven through fifteen of Jonathan C. Miesen's affidavit (Docket Number 61) is granted in part. The court shall accept paragraphs eleven and twelve to the extent that they authenticate Exhibits C and D, respectively.

**IT IS FURTHER ORDERED** that the court shall conduct a telephone status conference on **March 22, 2007, at 9:30 A.M.** to discuss the status of this case. The court shall initiate the call.

Dated at Milwaukee, Wisconsin, this 2nd day of March, 2007.


s/AARON E. GOODSTEIN
U.S. Magistrate Judge